# EXHIBIT C

Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

Page 1

Soranno v. New York Life Ins. Co.
N.D.Ill.,1999.

United States District Court, N.D. Illinois, Eastern Division.
Frank P. and Jean M. SORANNO, et al., Plaintiffs,
v.
NEW YORK LIFE INSURANCE COMPANY, et al., Defendants.
No. 96 C 7882.

Feb. 24, 1999.

MEMORANDUM OPINION AND ORDER

NORDBERG, District Court J.

*1 Plaintiffs seek to recover for losses relating to insurance policies, annuities, and mutual funds they purchased through an insurance agent named David Freitag. Plaintiffs have filed a 19-count complaint, asserting RICO claims, federal securities claims, and Illinois state law claims. Although David Freitag is a defendant in this action and apparently was the central actor in this alleged fraudulent scheme, the focus of plaintiffs' complaint is on the culpability of two insurance companies for whom Freitag worked as an agent. These insurance companies have filed motions to dismiss the complaint. For the reasons set forth below, their motions are granted in part and denied in part. Plaintiffs are given 21 days to file an amended complaint consistent with this opinion.

BACKGROUND

The following facts are taken from the original complaint, which is 78 pages long. Plaintiffs are individual investors, most of whom are Illinois residents.[FN1] From 1987 to 1995, they gave money to defendant David Freitag to purchase insurance policies, annuities, and/or mutual fund investments. (Cmplt. ¶ 49.) Plaintiffs allege that they suffered losses as a result of a fraudulent scheme conducted by Freitag.

FN1. For the sake of convenience, this court will generally refer to "plaintiffs" as a group even though they are not all involved in every aspect of the complaint nor included in every count.

During this 1987-1995 time period, Freitag worked as an agent for two different groups of insurance companies. From 1987 to December 1992, Freitag worked as an insurance and sales agent for New York Life Insurance Company and New York Life Insurance and Annuity Corporation.[FN2](¶ 50.) During this time, Freitag sold plaintiffs life insurance policies and annuities. Eventually, New York Life discovered irregularities in Freitag's customers' accounts and fired him in December of 1992.

FN2. For the sake of convenience and in keeping with the terminology used in the complaint, this court will refer to these two defendants collectively as "New York Life."

From December 1992 until sometime in 1994, Freitag worked as an insurance and sales agent for Lincoln National Life Insurance Co. and CMP Financial Services, Inc.[FN3] When he moved to Lincoln/CMP Freitag persuaded plaintiffs to transfer their accounts from New York Life to Lincoln/CMP, and by September 1993, plaintiffs had transferred their accounts over to Lincoln/CMP. While at Lincoln/CMP, Freitag sold plaintiffs mutual funds in addition to life insurance policies and annuities. In addition to bringing over his New York Life clients, Freitag also obtained new clients while at Lincoln/CMP. Eventually, Lincoln/CMP discovered irregularities in Freitag's customers' accounts and fired him. After leaving Lincoln/CMP, Freitag worked on his own as an insurance and sales agent and continued to find new clients. (¶ 80.)

FN3. The court will refer to these two defendants collectively as Lincoln/CMP. CMP is the registered representative of,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

Page 2

and offers securities to, Lincoln.

Freitag's general culpability is not really in dispute.[FN4] He has been convicted of fraud, has never appeared in this action, and subsequently has been defaulted. Instead, this lawsuit focuses on the potential liability of New York Life and Lincoln/CMP. Generally, the complaint alleges that Freitag worked as an insurance and sales agent for each company, that he received office space and secretarial support, and that he was supervised by someone at each company. (¶¶ 64, 73.) The complaint alleges that each insurance company "held itself out to the general public as a company that sold life insurance policies, annuities, and offered other investment opportunities through its registered agents, one of whom was Freitag."(¶¶ 50-51.)

> FN4. Of course, there may be a dispute as to the specific details and extent of Freitag's behavior.

*2 The complaint alleges three general types of wrongdoing by defendant Freitag. First, the complaint alleges that, in order to induce plaintiffs to invest in the insurance policies, annuities, and mutual fund investments, Freitag made false representations regarding the safety and expected performance of these investments. Second, the complaint alleges that Freitag tampered with plaintiffs' accounts by withdrawing money over forged signatures and by transferring money between different accounts without plaintiffs' permission or knowledge. Finally, the complaint alleges that Freitag concealed the true nature of plaintiffs' investments by sending plaintiffs false monthly statements that overstated the balances in their accounts.

*Misrepresentations at the Time of Purchase*

The complaint alleges that Freitag made certain misrepresentations at the time plaintiffs gave him money to purchase the various financial products. Specifically, with regard to the annuities sold while at New York Life, Freitag falsely represented that the principal amounts of the annuities were "safe and secure," that plaintiffs would receive interest payments, and that the interest earned would be at least 19.5%. (¶ 59.) With regard to the life insurance policies sold while at New York Life, Freitag falsely represented that plaintiffs would never have to pay premiums on their policies to keep them in effect, that the principal and interest earned would be sufficient for retirement, that the life insurance policies were primarily investment vehicles designed to earn non-taxable income on the principal amount, and that there was a guarantee the policies would never lapse. (¶ 61.) As a result of Freitag's misconduct, many plaintiffs lost all their money because their policies lapsed when the premiums were not paid. *Id.*

The complaint contains similar allegations regarding Freitag's work while at Lincoln/CMP. Starting in December 1992, Freitag allegedly persuaded plaintiffs to invest with Lincoln/CMP rather than New York Life. Freitag falsely represented to plaintiffs that Lincoln/CMP was offering a higher rate of return on their investments than New York Life, that they would not lose any of their principal, and that the interest earned on their policies would again pay the premiums. (¶ 74.) Freitag also represented-as he had done while at New York Life-that the life insurance policies and annuities were investment opportunities to earn high non-taxable interest on the principal payments. *Id.* Finally, while at Lincoln/CMP, Freitag allegedly induced plaintiffs to purchase interests in a mutual fund by falsely representing that this investment was safe and would generate high returns on principal and by representing that plaintiffs would not lose their principal investment. (¶ 76.)

The complaint does not allege that either New York Life or Lincoln/CMP was aware of the alleged misrepresentations made by Freitag nor does it allege that either of these defendants participated actively in the sale of the insurance policies, annuities, and mutual funds.

*Unauthorized Withdrawals and Transfers*

*3 The complaint alleges that money was withdrawn from plaintiffs' accounts by means of their

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

Page 3

forged signatures and that money was transferred between their accounts in order to pay the premiums on the plaintiffs' insurance policies. (¶¶ 66-70.) These allegations appear to relate solely to the time period Freitag was at New York Life and thus do not concern Lincoln/CMP.

The complaint alleges that money was transferred from one plaintiff's account to another plaintiff's account "in order to pay the premiums on the plaintiff's insurance policies."(¶ 66.) [FN5] Although the complaint is not specific with regard to who initiated this process, the complaint states that New York Life executed these transactions. *Id.* (New York Life "began to transfer money"; New York Life "caused" the unauthorized transfers). However, the complaint does not specifically state that New York Life was aware of the unauthorized nature of these transfers at the time they were made nor that New York Life made them in order to defraud plaintiffs.

> FN5. These transfers took place between April of 1991 and October of 1992. Paragraph 66 contains a list setting forth a specific date, the policy owner from and to whom the transfer was made, and the dollar amount for each of the 25 separate transactions.

The complaint alleges that New York Life eventually reversed the unauthorized transfers relating to plaintiff N. Lewis but never reversed the other transactions nor informed the other plaintiffs of the irregularities in their accounts. (¶ 69.) It appears that New York Life fired Freitag shortly after New York Life discovered the account irregularities. (¶ 72.) [FN6]

> FN6. The complaint alleges that, on or about November 9, 1993, the NASD filed a formal complaint against Freitag alleging that in 1991 he arranged to have funds transferred from one annuity account at New York Life to other accounts to pay for life insurance premiums. (¶ 53.)

On two separate occasions, New York Life "caused to be transferred" a sum of money from the annuity of one plaintiff (Martha Sorrano) into a personal money market account owned by Freitag. (¶ 67-68.) The complaint does not state what role Freitag played in these transactions, whether they were accomplished by forgeries, nor does the complaint allege that New York Life was aware of their unauthorized nature or made them in order to defraud plaintiff Sorrano.

The complaint also alleges that withdrawals and transfers of funds in plaintiffs' accounts "on the forged signatures of the account holders."(¶ 70.) [FN7] New York Life executed the transfers but allegedly failed "to check to see if the signatures [ ] were genuine, nor did it impose any controls to check the genuineness of the signatures, such as requiring a witness, signature guarantee or notary of the signature."(¶ 71.)

> FN7. The forged transfers and withdrawals took place between January of 1990 and March of 1993. Paragraph 70 contains a list setting forth a date, an account number, and the name of the policy owner for each of 29 separate transactions.

*Sending False Monthly Account Statements*

The complaint alleges that Freitag sent plaintiffs false statements concerning the status and performance of their investments. Beginning in 1991, Freitag began sending out monthly statements to the plaintiffs who had invested with him. (¶ 65.) Freitag did so "on behalf of New York Life and as an agent of New York Life."*Id.* The monthly statements allegedly were false and misleading in that, among other things, they contained a false statement of the cash value of the particular insurance policy, a false statement of the interest credited for the policy, and a false statement of the total life insurance benefits. The monthly statements were sent on New York Life letterhead and listed Freitag as "Agent" for New York Life. The complaint attaches samples of those letters as Exhibit A. Similar false statements were sent on Lincoln/CMP letterhead during the relevant period. (¶ 75.)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                              Page 4
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
**(Cite as: Not Reported in F.Supp.2d)**

The complaint attaches samples of those letters as Exhibit B.

*4 The complaint alleges that both New York Life and Lincoln/CMP fired Freitag for irregularities in his customers' accounts but that the defendants never informed any of the plaintiffs of such irregularities. (¶¶ 72, 79.)

The complaint also alleges the following facts concerning public knowledge of Freitag's allegedly fraudulent behavior. As already noted, on or about November 9, 1993, the NASD filed a formal complaint against Freitag alleging that in 1991 he arranged to have funds transferred from one annuity account at New York Life to other accounts to pay for life insurance premiums. (¶ 53.) On or about October 7, 1994, Freitag allegedly consented to a disciplinary order by the Illinois Department of Insurance. (¶ 55.) On October 5, 1995, Freitag filed for bankruptcy under Chapter 11. (¶ 45.) On or about March 1, 1996, Freitag was arrested and charged with 30 counts of fraud, theft by deception, and financial exploitation of the elderly.[FN8](¶ 57.)

> FN8. Counsel has informed this court that Freitag has been convicted of fraud and is now in prison.

*Legal Standard*

Before the court are the defendants' motions to dismiss. In considering a Rule 12(b)(6) motion to dismiss, this court must accept as true all well pleaded factual allegations in the complaint and view them, along with the reasonable inferences to be drawn from them, in the light most favorable to the plaintiff. *Cornfield v. Consolidated High School District No. 230,* 991 F.2d 1316, 1324 (7th Cir.1993). A motion to dismiss may be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v.. Gibson,* 355 U.S. 41, 45-46 (1957). A plaintiff may plead conclusions but those conclusions "must provide the defendant with at least minimal notice of the claim." *Jackson v. Marion County,* 66 F.3d 151, 154 (7th Cir.1995).

In *Bennett v. Schmidt,* 153 F.3d 516 (7th Cir.1998), the Seventh Circuit emphasized that a complaint is "just the starting point" and that a plaintiff need not include in her complaint "the evidence needed to prevail at trial."*Id.* at 518."Instead of lavishing attention on the complaint until the plaintiff gets it just right, a district court should keep the case moving-if the claim is unclear, by requiring a more definite statement under Rule 12(e), and if the claim is clear but implausible, by inviting a motion for summary judgment."*Id.* With these principles in mind, this court will review defendants' arguments.

ANALYSIS

Although the complaint contains numerous and lengthy allegations, as well as multiple counts, its general theory of accountability against these insurance companies can be reduced to a more simpler formulation. In fact, in their response brief, plaintiffs provide the following helpful description of their overarching theory against these two insurance companies: "This lawsuit has been filed to place responsibility for the financial ruin of these plaintiffs where it lies: on the large, reputable companies that held Freitag out to the general public as a trustworthy financial advisor and agent."(Pls. Resp. Mem. at 4.) Of course, in considering these motions to dismiss, this court must analyze whether the particular allegations of the complaint state a cause of action under any of the numerous federal and state causes of action relied upon by these plaintiffs.

I. RICO Claims-Counts I-IV

*5 In the first four counts of the complaint, plaintiffs assert RICO claims. NY Life and Lincoln/CMP set forth a number of arguments as to why those counts should be dismissed.

A. Whether Plaintiffs' RICO Claims Are Preempted Via The McCarran-Ferguson Act.

Lincoln/CMP raises an initial question as to

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                           Page 5
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

whether, under the McCarran-Ferguson Act, 15 U.S.C. §§ 1011-1015, Illinois insurance law preempts the civil RICO claims. The McCarran-Ferguson Act provides generally that, absent Congressional legislation, states will be given authority to regulate the insurance industry. Section 2(b) of the Act states in relevant part: "No Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance ... unless such Act specifically relates to the business of insurance."15 U.S.C. § 1012(b). Lincoln/CMP argues that Illinois has a statute governing the conduct at issue here. Specifically, Section 149 of the Illinois Insurance Code governs representations made in the course of the sale of insurance. 215 ILCS 5/149. As a result, Lincoln/CMP argues that the RICO claims here are preempted by Illinois law.

Courts of appeals have split on the specific question of whether the McCarran-Ferguson Act allows state law to preempt a civil RICO claim based on fraudulent conduct involving the sale of insurance products. *Compare Doe v. Norwest Bank Minnesota, N.A.,* 107 F.3d 1297 (8th Cir.1996) (finding McCarran-Ferguson Act preemption) *with Sabo v. Metropolitan Life Ins.,* 137 F.3d 185 (3d Cir.1998) (finding no preemption). In their briefs to this court, the parties debate this case law and make various arguments for or against preemption. In addition, the parties debate whether all of the allegedly fraudulent actions even related to the business of insurance.

After the parties briefed these issues, however, the Supreme Court issued a new ruling addressing this specific question. *Humana Inc. v. Forsyth,* 119 S.Ct. 710, 714 (1999). In *Humana,* the Supreme Court set out a new formulation to determine whether the RICO statute "impairs" a particular state's insurance laws: "[w]hen federal law is applied in aid or enhancement of state regulation, and does not frustrate any declared state policy or disturb the State's administrative regime, the McCarran-Ferguson Act does not bar the federal action."FN9

FN9. In addition, also after the parties have filed their briefs, the Seventh Circuit issued a ruling clarifying the appropriate test to use in determining McCarran-Ferguson Act preemption. *Autry v. Northwest Premium Services, Inc.,* 144 F.3d 1037 (7th Cir.1998). The Seventh Circuit held that courts in this district should use a three-part test rather than the four-part test to determine McCarran-Ferguson Act preemption. *Id.* at 1042.The parties in this case briefed the issue under the four-part test rather than the three-part test.

As a result, the court has not received the benefit of the parties' positions in light of the new ruling by the Supreme Court. Because this court finds, as set forth below in Sections I.B and I.C, that plaintiffs' RICO claims should be dismissed for other reasons, this court will not reach this question at this point. However, if plaintiffs attempt to include any additional RICO claims in an amended complaint, they are advised that they will face a strong argument that their claims are preempted under the McCarran-Ferguson Act.

B. Counts I and III- § 1962(a)

*6 Plaintiffs assert a § 1962(a) RICO claim against New York Life and Freitag (Count I) and against Lincoln/CMP and Freitag (Count III). Section 1962(a) states that no person may use or invest any income derived from a pattern of racketeering activity in the establishment or operation of a RICO enterprise. 18 U.S.C. § 1962(a). The complaint defines New York Life and Lincoln/CMP as the RICO "enterprises" and Freitag as the RICO "person." 1 8 U.S.C. §§ 1 961(3) & (4); Cmplt. ¶¶ 88, 105. Defendants argue, among other things, that the § 1962(a) claims should be dismissed because plaintiffs have not alleged that they were injured by reason of defendants' use or investment of the alleged racketeering income. Based on this argument, as set forth below, this court dismisses plaintiffs' § 1962(a) claims.

Section 1964(c) provides a civil cause of action

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690  
(Cite as: Not Reported in F.Supp.2d)

Page 6

to any person "injured in his business or property by reason of a violation of 1962." As noted above, § 1962(a) proscribes the "use or investment" of racketeering income in the enterprise. Based on the causal language of § 1964 ("by reason of"), courts have held that a RICO plaintiff must allege that he or she was injured by reason of the "use or investment" of the racketeering income and not simply that he or she was injured by the racketeering activity itself. *See, e.g., Parker & Parsley Petroleum Co. v. Dresser Indus.,* 972 F.2d 580, 584 (5th Cir.1992) ("[T]he causal language of section 1964(c) requires that the compensable injury stem from the violation of the RICO section in question, so any injury under section 1962(a) must flow from the use or investment of racketeering income."). This requirement arises from the language of the statute and sometimes has been referred to as the use or investment rule.

Although the Seventh Circuit has not had occasion to consider whether to adopt the use or investment rule, it has noted that the majority of circuits have held that the use or investment of the racketeering income must proximately cause plaintiff's injury. *Vicom, Inc. v. Harbridge Merchant Services, Inc.,* 20 F.3d 771, 778 n. 6 (7th Cir.1994). In fact, all but one of the circuit courts of appeal have imposed a use or investment requirement on a plaintiff asserting a claim under § 1962(a). *See Flynn v. Corus Bank,* 1998 WL 851498, * 3 (N.D.Ill.Dec. 3, 1998) (citing cases). Defendants also point out that some district courts in this circuit also have imposed such a requirement. *See, e.g., Fujisawa Pharmaceutical Co., Ltd. v. Kapoor,* 814 F.Supp. 720, 734-35 (N.D.Ill.1993).

Plaintiffs do not dispute that, if the use or investment rule is applied, their claims must fail. And plaintiffs do not really offer any serious argument that the use or investment rule should not be applied.[FN10] Accordingly, based on plaintiffs' failure to allege that they were injured by the use or investment of the alleged racketeering proceeds, this court dismisses plaintiffs' § 1962(a) RICO claims with prejudice.

FN10. Plaintiffs merely state that those circuits that have adopted the use or investment rule have also embraced respondeat superior and vicarious liability under § 1962(c).

C. Counts II and IV-Aiding And Abetting RICO Violations

*7 Plaintiffs assert claims for aiding and abetting a RICO violation. In Count II, plaintiffs allege that New York Life aided and abetted Freitag in a violation of § 1962(c). In Count IV, plaintiffs allege that Lincoln/CMP aided and abetted Freitag in a violation of § 1962(a). As set forth below, this court dismisses the aiding and abetting claims based on the Supreme Court's ruling in *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164 (1994).

In *Central Bank,* the Supreme Court held that there was no aiding and abetting liability for a violation of § 10(b) of the Securities Exchange Act of 1934. The Supreme Court discussed the proper inquiry for a court to use in determining whether there is aiding and abetting liability under a federal statute. The Supreme Court first noted that there is no "general aiding and abetting statute":

Congress has not enacted a general aiding and abetting statute .... [W]hen Congress enacts a statute under which a person may sue and recover damages from a private defendant for violation of a statutory norm, there is no general presumption that plaintiff may also sue aiders and abettors.

*Id.* at 182. Therefore, courts must analyze the "the text of the statute" in question to see if it provides for such a claim. After analyzing the language of the 1934 Act, the Supreme Court concluded that Congress did not include a provision for aiding and abetting a violation.

Since *Central Bank,* there has been some uncertainty whether its rationale also precludes aiding and abetting claims under RICO. *Compare In re Lake States Commodities, Inc.,* 936 F.Supp. 1461 (N.D.Ill.1996) (no private right of action); *Department of Economic Dev. v. Arthur Andersen & Co.,*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                      Page 7
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

924 F.Supp. 449, 475-78 (S .D.N.Y.1996) ( same); with *American Automotive Accessories, Inc. v. Fishman,* 1996 WL 480369, *6 (N.D.Ill. Aug. 21, 1996) (rejecting argument based on *Central Bank* ).

Recently, the Third Circuit addressed this issue and concluded that in light of *Central Bank* there is no aiding and abetting claim under RICO. In *Rolo v. City Investing Co. Liquidating Trust,* 155 F.3d 644, 656-57 (3rd Cir.1998), the Third Circuit stated that it was "convinced" that a private cause of action for aiding and abetting a RICO violation "cannot survive" in light of *Central Bank. Id.* at 656.The Third Circuit first summarized the analysis in *Central Bank* regarding aiding and abetting under § 10(b) of the 1934 Act and concluded that "the same analysis controls our construction of the civil RICO provision."*Id.* at 657.The court noted that, "[l]ike § 10(b), the text of § 1962 itself contains no indication that Congress intended to impose civil aiding and abetting liability under RICO."*Id.*

Likewise, in *In re Lake States Commodities, Inc.,* 936 F.Supp. 1461 (N.D.Ill.1996), Judge Aspen earlier reached the same result:
Because Congress knows how to impose aiding and abetting liability, ... we can assume that if the legislature had intended to hold aiders and abettors of § 1962(c) accountable, then it would have included such language in that subsection of the statute.... [N]o such cause of action exists.

*8 *Id.* at 1475.This court agrees with these decisions and finds that plaintiffs here cannot state an aiding and abetting claim under RICO in light of *Central Bank.*

Plaintiffs argue that there should be a claim for aiding and abetting a RICO violation and point to cases allowing such a cause of action. Plaintiffs rely, however, mostly on cases decided before *Central Bank.*The one decision issued after *Central Bank* was the Third Circuit's ruling in *Jaguar Cars, Inc. v. Royal Oaks Motor Car Co.,* 46 F.3d 258 (3d Cir.1995). In *Rolo,* however, the Third Circuit distinguished its earlier decision in *Jaguar Cars,* noting that it "did not address the impact of *Central Bank of Denver* on earlier cases that had recognized a private cause of action for aiding and abetting under RICO" but instead "focused on whether there had been sufficient evidence to find the defendant liable for aiding and abetting a RICO violation."155 F.3d at 657. In sum, Counts II and IV are dismissed with prejudice.

II. Federal Securities Law Claims-Counts V-VI.

Plaintiffs assert a claim under the Securities Exchange Act of 1934 (the "1934 Act") against New York Life (Count V) and Lincoln/CMP (Count VI). Both defendants argue that plaintiffs have failed to allege the elements of a federal securities claim. In addition, New York Life argues that plaintiffs only purchased insurance policies and annuities from New York Life and that those investments are not "securities" under the 1934 Act. New York Life also argues that the 1934 Act claim against it is barred by the three-year statute of repose.

A. Whether The Investments Are Securities?

An initial threshold question for any federal securities claim is "whether a security exists." *S.E.C. v. Lauer,* 864 F.Supp. 784, 789 (N.D.Ill.1994), *aff'd,*52 F.3d 667 (7th Cir.1995). New York Life argues that Count V should be dismissed because plaintiffs' investments are not "securities" within the meaning of the federal securities laws. In Count V, plaintiffs allege that while Freitag was at New York Life, he sold "annuities and other securities." (¶ 123). The question of whether plaintiffs purchased a "security" focuses solely on the annuities and not on the insurance policies or mutual funds.FN11

> FN11. There is no dispute that the life insurance policies are not securities and that the mutual funds are securities.

In their briefs, both sides agree that in certain circumstances an annuity may constitute a security for the purposes of the federal securities acts and

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                                 Page 8
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

that this determination depends on the attributes of the particular annuity. Both sides also discuss the same two Seventh Circuit cases. *Associates In Adolescent Psychiatry, S.C. v. Home Life Ins. Co.,* 941 F.2d 561 (7th Cir.1991) (holding that a variable annuity was not subject to registration under 15 U.S.C. § 77c(a)(8)); *Peoria Union Stock Yards Co. Retirement Plan v. Penn Mut. Life Ins. Co.,* 698 F.2d 320 (7th Cir.1983) (holding that a variable annuity was a security).

The federal securities acts define "securities" to include "any ... investment contract." *Id.* at 323. The term "investment contract" is "a catch-all to bring within the securities acts interests that have the functional attributes of stock and other formal securities but are not so denominated."*Id* . at 324. The Supreme Court has stated that an "investment contract" is a "contract whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter ...."*Id*.(quoting *SEC v. W.J. Howey Co.,* 328 U.S. 293, 298 (1946)).

*9 To determine whether an annuity is a security, it is important to ask whether the annuity places the investment risk on the seller or buyer of the annuity. *Id.* at 325. On the one hand, a traditional or fixed annuity does not place the risk on the buyer because the seller promises to pay the buyer a fixed amount. *Associates,* 941 F.2d at 565. On the other hand, a seller may "pin[ ] the label 'annuity' on a mutual fund, in which the buyer bears all the risk."*Id.* at 566. Variable annuities lie somewhere in between. The relevant question with respect to variable annuities is whether they place the entire investment risk on the buyer or whether they provide some guarantee to the buyer. This question can be answered in a particular case only by looking at the particular facts of the variable annuity in question.

Turning to the facts of this case, this court notes that plaintiffs have conclusorily plead that the annuities they purchased are securities within the meaning of the federal securities laws. (¶ 58.) In their brief, plaintiffs state that the annuities had a variable interest rate. New York Life argues that the annuities sold by Freitag do not involve "the kind of risk taking in a commercial enterprise that characterizes a security."(N.Y.L Mem. at 9.) Both parties cite to paragraph 59 of the complaint to support their position. Unfortunately, however, Paragraph 59 merely describes the false representations made by Freitag about the supposed attributes of the annuity. If the representations made by Freitag in Paragraph 59 were in fact true, it would seem clear that these annuities are not securities given that they would have paid out a guaranteed (and substantial) minimum interest rate of 19.5%. However, the complaint does not describe the actual attributes of the annuities. Therefore, subject to the discussion in Section II.B & C below, this court dismisses the securities' counts relating to the sale of annuities because plaintiffs have not sufficiently alleged that the annuities were securities under the 1934 Act.

B. A 1934 Act Cause of Action

To the extent the 1934 Act applies, this court will now examine defendants' argument that plaintiffs have failed to plead the necessary elements of a 1934 Act claim. Although plaintiffs purport to assert a claim under the 1934 Act, they do not even identify a particular section of the 1934 Act. The defendants state that the only possible claim under the allegations is one for controlling person liability under § 20(a) of the 1934 Act based on Freitag's alleged violation of § 10(b) of the 1934 Act. *See*15 U.S.C. § 78j(b); § 78t; Cmplt. ¶ 123 ("New York Life controlled the actions and activities of Freitag while he was an agent of New York Life"); ¶ 128 (same). Plaintiffs do not object to this characterization. Accordingly, this court will construe Counts V and VI as such a claim and then consider defendants' arguments.

The defendants do not object to the allegations relating to controlling person liability under § 20(a).*See Harrison v. Dean Witter Reynolds, Inc.,* 79 F.3d 609 (7th Cir.1996) (discussing controlling person liability). Their only real objection is that plaintiffs have not sufficiently alleged the necessary

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 9
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
**(Cite as: Not Reported in F.Supp.2d)**

elements to state an underlying primary violation against Freitag for violation of § 10(b) of the 1934 Act. *See FMC v. Boesky,* 727 F.Supp. 1182, 1199 n. 19 (N.D.Ill.1989), *aff'd,* 36 F.3d 255 (2nd Cir.1994) (defendant cannot be liable as a controlling person unless a primary violation of the securities laws is alleged). Specifically, defendants argue that plaintiffs have not plead Freitag's fraud with particularity as required under Rule 9(b) nor alleged scienter. Although defendants argue that the allegations are not specific enough, defendants have not pointed to any serious defect in those allegations.

*10 This court finds that plaintiffs have sufficiently pleaded the basic elements of the underlying violation under § 10(b).*See In re Healthcare Compare Corp. Sec. Litig.,* 75 F.3d 276, 280 (7th Cir.1996) ("To state a valid Rule 10b-5 claim, a plaintiff must allege that the defendant (1) made a misstatement or omission, (2) of material fact, (3) with scienter, (4) in connection with the purchase or sale of securities, (5) upon which the plaintiff relied, and (6) that reliance proximately caused plaintiff's injuries."). Plaintiffs have alleged that Freitag made material misrepresentations of fact each time plaintiffs purchased their investments, that Freitag acted with scienter, that plaintiffs relied on those misrepresentations, and that plaintiffs were injured. In particular, plaintiffs have set forth the specific misrepresentations made by Freitag in several different places in the complaint (*see* ¶¶ 59, 61, 74, 76), thus providing defendants with the particulars of the fraudulent scheme. *Dileo v. Ernst & Young,* 901 F.2d 624, 627 (7th Cir.1990) (securities fraud plaintiff must plead "the who, what, when, where, and how: the first paragraph of any newspaper story"). Moreover, plaintiffs have alleged sufficient circumstantial evidence to support a strong inference that Freitag acted with the requisite scienter, including, among other things, the allegation that Freitag forged plaintiffs' signatures on account documents.

C. Three-Year Statute of Repose.

New York Life argues that Count V is barred by the one-year statute of limitations and the three-year statute of repose applied to claims under Section 10(b) and Rule 10b-5. Under § 10(b) and Rule 10b-5 the action must be filed within one year after discovery of the facts constituting the violation and within three years of the violation. *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* 501 U.S. 350 (1991). New York Life argues that the allegations of the complaint show that Freitag was fired by New York Life in December of 1992, that all of plaintiffs' accounts were transferred by September of 1993, and that this action was not filed until November of 1996. (¶¶ 50, 72, 74.) In response, plaintiffs do not dispute that they filed their complaint over three years from the time any of them did business with New York Life. Plaintiffs instead argue their claims should be saved by the doctrine of fraudulent concealment or equitable estoppel based on the fact that Freitag sent out false monthly account statements and the fact that New York Life never informed plaintiffs concerning the irregularities in their accounts.[FN12]

> FN12. Plaintiffs also argue that the one-year statute of limitations and the three-year statute of repose do not apply to claims for controlling person liability. However, plaintiffs offer no other limitations period nor provide any case law or analysis that would support different limitations periods than the one-year/three-year periods. *See Dodds v. Cigna Sec., Inc.,* 12 F.3d 346, 350 n. 2 (2d Cir.1993) ("Because Section 20 merely creates a derivative liability for violations of other sections of the Act, claims under Section 20 are governed by the limitations periods for those other sections.").

At issue is whether the statute of repose can be tolled by certain equitable tolling doctrines. Although plaintiffs seek to rely on those doctrines, they do not apply to the three-year statute of repose. *Lampf,* 501 U.S. at 363 ("The three-year limit is a period inconsistent with tolling."); *Komanoff v. Mabon, Nugent & Co.,* 884 F.Supp. 848, 853 (S.D.N.Y.1995) (the three-year statute of repose ap-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d  
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690  
(Cite as: Not Reported in F.Supp.2d)

Page 10

plies "even when the plaintiff's failure to bring suit within three years is due to fraudulent concealment"). Plaintiffs do not argue that any of the alleged securities violations against New York Life occurred less than three years before the filing of their complaint. As a result, based on the allegations of the current complaint, the court finds that plaintiffs cannot state a claim under the 1934 Act against New York Life and therefore dismisses Count V with prejudice.

III. State Law Claims-Counts VII-XIX

*11 Plaintiffs have filed a number of state law claims. As discussed below, defendants argue that the state law claims should be dismissed for a number of reasons.[FN13] The parties agree that Illinois law should be applied to all of the state law claims. This court will address each claim below.

> FN13. Defendants also seek to dismiss the pendent state law claims for lack of jurisdiction under § 1367. Because plaintiffs will be granted leave to file an amended complaint, this court will not dismiss the supplemental state law claims for lack of jurisdiction at this point.

A. Fraud-Count VII (against New York Life)

In Count VII, plaintiffs assert a claim for fraud under Illinois law against New York Life. (Plaintiffs have not asserted a fraud claim against Lincoln/CMP.) Plaintiffs make two general types of allegations. First, plaintiffs allege that "New York Life, through its agent, Freitag, made false and misleading statements of material fact" as set forth in paragraphs 61 and 65. (¶ 133.) Paragraph 61 details the misrepresentations made by Freitag to plaintiffs at the time they purchased life insurance policies. Paragraph 65 states that Freitag sent out false monthly account statements. Second, plaintiffs allege that New York Life "failed to inform the plaintiffs ... of the conduct of Freitag while Freitag was employed by New York Life."(¶ 134.) New York Life argues that plaintiffs cannot allege a fraud claim for either of the two types of alleged wrongdoing.

With regard to the first type of allegation, New York Life first argues that plaintiffs have failed to allege fraud with particularity as is required by Fed.R.Civ.P. 9(b). Plaintiffs' fraud claim relates to the fraudulent statements made by Freitag. New York Life's argument is the same basic argument made above with respect to the sufficiency of the allegations regarding Freitag's violation of § 10(b). For the same reasons stated above, this court concludes that plaintiffs have alleged sufficient facts concerning Freitag's fraud. They have set forth the statements he made and have alleged that they were made each time plaintiffs purchased the investments. This court believes that this information is sufficient to provide plaintiffs with notice of the claim.[FN14]

> FN14. New York Life also argues that one of the specific alleged representations in paragraph 61 is not actionable as fraud because it is nothing more than a prediction of future events. *See, e.g., Continental Bank N.A. v. Meyer,* 10 F.3d 1293, 1298-99 (7th Cir.1993). Specifically, New York Life refers to the Freitag's alleged statement to plaintiffs that they "would never have to pay premiums in order to keep the insurance in effect."(¶ 61.) Although plaintiffs do not address this argument in their response brief, it is not clear based on the current allegations that this statement is merely a prediction of future events.

However, with regard to the second type of allegation, defendants correctly argue that plaintiffs have failed to establish that the defendants had a duty to speak. *See Northern Trust Co. v. VIII South Michigan Assocs.,* 657 N.E.2d 1095, 1102 (Ill.App.Ct.1995) (unless there is a duty to disclose, nondisclosure does not support a fraud claim); *Lidecker v. Kendall College,* 550 N.E.2d 1121, 1124 (Ill.App.Ct.1990) ("Plaintiff must ... establish that defendant has a duty to inform plaintiff of any allegedly omitted material fact."). Plaintiffs have not

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 11
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
**(Cite as: Not Reported in F.Supp.2d)**

responded to this argument nor pointed to any case law supporting their argument that New York Life had a duty to disclose the allegedly undisclosed facts. Therefore, this court dismisses with prejudice the portions of the fraud claim relating to the second type of allegations concerning the duty to disclose.

B. Negligence Claims-Counts VIII-XI

Plaintiffs assert two different types of negligence claims against each defendant. First, plaintiffs assert a claim against both defendants for negligent misrepresentation under Illinois law (Counts X-XI) based on defendants alleged breach of their duty "to convey accurate information to [plaintiffs] regarding their accounts ."(¶¶ 155, 165.) Second, plaintiffs assert a claim against New York Life (Count VIII) for negligent supervision and retention of Freitag and a claim against Lincoln (Count IX) for negligent hiring, supervision, and retention.[FN15] Defendants' primary argument for dismissing both types of negligence claims is that they are barred are barred under the *Moorman* doctrine. *Moorman Mfg. Co. v. Nat'l Tank Co.,* 435 N.E.2d 443 (Ill.1982).

> FN15. The counts are similar against each defendant except that plaintiffs do not allege that New York Life was negligent in "hiring" Freitag.

*12 The *Moorman* doctrine is commonly referred to as the "economic loss doctrine." As typically stated, this doctrine prohibits recovery of economic losses under a tort theory. *Moorman* involved the sale of a defective product, and the plaintiff purchaser sought to recover damages for economic loss in tort. Subsequently, in *Anderson Elec., Inc. v. Ledbetter Erection Corp.,* 479 N.E.2d 476, 479 (Ill.App.Ct.1985), the *Moorman* doctrine was extended from cases involving the sale of products to cases involving services.

Although the *Moorman* doctrine is broad, there are a number of exceptions. In particular, economic losses are recoverable in tort "(1) where the plaintiff has sustained personal injury or property damage that has resulted from a sudden or dangerous occurrence; (2) where the plaintiff's damages are the proximate result of the defendant's intentional, false misrepresentation; or (3) where the plaintiff's damages are a proximate result of the negligent misrepresentation by a defendant in the business of supplying information for the guidance of others in their business transactions."*Singer v. Bulk Petroleum Corp.,* 9 F.Supp.2d 916, 921 (N.D.Ill.1998). In addition to these three well-known exceptions, the Illinois Supreme Court also has stated that an exception applies where the tort duty is extracontractual. *Congregation of the Passion v. Touche Ross & Co.,* 636 N.E.2d 503 (Ill.1994). As discussed below, plaintiffs rely on a different exception for each of the two types of alleged negligence.

1. Negligent Misrepresentation

Defendants rely on the *Moorman* doctrine as their only argument to dismiss the negligent misrepresentation claim. Plaintiffs seek to fall within the exception concerning a defendant in the business of supplying information for the guidance of others in their business transactions. As set forth below, this court finds that plaintiffs cannot qualify under this exception.

In their opening briefs, defendants rely primarily on this court's earlier ruling in *Gerdes v. John Hancock Mut. Life Ins. Co .,* 712 F.Supp. 692 (N.D.Ill.1989), which involved a negligent misrepresentation claim against an insurance broker. In *Gerdes,* this court first discussed the requirement that the defendant be in the business of supplying information and noted that the case law contains three categories of businesses. First, there are businesses "that provide a noninformational product or service-usually tangible goods."*Id.* at 697.Such businesses clearly would not meet the requirement of being in the business of supplying information. Second, at the opposite end of the continuum, there are businesses "that provide a product consisting solely of information ."*Id.* at 698.Such business

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d    Page 12
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
**(Cite as: Not Reported in F.Supp.2d)**

clearly would meet the requirement. Finally, there is a third category containing businesses which furnish "both information as well as noninformational goods and services." *Id.* To determine whether a business in this third category is in the business of supplying information, the court must determine whether the information supplied was "central to" or an "important part of" the transaction. *Id.*

*13 In applying this framework in *Gerdes,* this court concluded that it was important to determine whether the insurance salesman in the case acted as an insurance broker or insurance agent. This court found this distinction critical:

In this case it is plausible that Jones acted as an insurance agent who sold Hancock insurance policies only and therefore discussed only Hancock products with the plaintiffs. *If so, the nature of Jones' business was to provide a noninformational product (an insurance policy), and any information provided by the defendant would have been merely incidental to the sale of the policy.* This situation would lie at the end of the continuum where the information provided is of the sort that does not meet the "in the business of supplying information" test. On the other hand, it is conceivable that Jones was an independent insurance broker who sold policies for multiple insurance companies. If so, then the nature of Jones' business may have been to provide information as well as a noninformational product. Under such circumstances, his business could lie in the gray area between those cases in which the defendants are clearly in the business of supplying information and those in which they are not.

*Id* at 699-700 (emphasis added).

This court finds that *Gerdes* answers the question in this case. Here, it is undisputed that Freitag acted as an insurance agent and not a broker (*see, e.g.,* ¶ 51), and therefore this court finds that plaintiffs cannot bring a negligent misrepresentation claim. In their response brief, plaintiffs did not even discuss *Gerdes* nor do they effectively rebut the other cases cited by defendants supporting the claim that insurers generally are not in the business of supplying information. *See, e.g., Univ. of Chicago Hosp. v. United Parcel Service,* 596 N.E.2d 688, 691 (Ill.App.Ct.1992). In addition, the allegations in the complaint support the view that the information supplied was incidental to the sale of the insurance policies and annuities. Plaintiffs allege defendants failed to provide accurate information "regarding" their accounts. (¶¶ 155, 165.) This allegation confirms that the information was not a central to the basic transactions, which involved the sale of insurance policies and annuities. Accordingly, plaintiffs' negligent misrepresentation claims are dismissed with prejudice.[FN16]

> FN16. As a result, this court will not address whether plaintiffs have met the second requirement that the information was provided to them for the guidance with others.

2. Negligent Hiring, Supervision, and Retention

Although defendants rely on a number of arguments to dismiss the negligent hiring, supervision, and retention claims, their primary argument is that such claims also are barred under the *Moorman* doctrine. Before addressing this argument, this court will first address defendants' other arguments.

The Illinois appellate court recently summarized the elements of these three causes of action:

Negligent and/or reckless hiring, supervision, and retention are distinct causes of action. A cause of action for negligent hiring alleges that: (1) an employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons, (2) the unfitness was known or should have been known at the time of hiring, and (3) the unfitness proximately caused the claimed injury. Negligent supervision alleges that: (1) an employer had a duty to supervise its employees, (2) the employer negligently supervised an employee, and (3) such negligence proximately caused the plaintiff's injuries. Negligent retention alleges that: (1) an employer knew or should have known that the employee had a particular unfitness for the position so as to create a danger of harm to third persons, (2) the employer

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                      Page 13
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
**(Cite as: Not Reported in F.Supp.2d)**

retained the employee in his or her employment even after the employer knew or should have known about the unfitness, and (3) the unfitness proximately caused the claimed injury.

*14 *Van Horne v. Muller,* 691 N.E.2d 74 (Ill.App.Ct.1998), *rev'd on other grounds,* 1998 WL 906736, *5 (Ill.Sup.Ct. Dec. 3, 1998).[FN17]

> FN17. Although the Illinois Supreme Court reversed the appellate court on other grounds, it did not comment on the appellate court's recitation of the elements required to sustain each of these three causes of action. *See* 1998 WL 906736 at *5.

First, Lincoln/CMP argues that there is no cause of action for negligent supervision. Based on *Van Horne,* it appears that Illinois does recognize such a cause of action. Second, Lincoln/CMP argues that plaintiffs should not combine these three torts into one. Although this court agrees, it will not dismiss the complaint on this ground. Third, Lincoln/CMP argues that plaintiffs' allegations are conclusory and that plaintiffs have not alleged that Lincoln/CMP knew or should have known that Freitag was unfit for his position. This court disagrees. As an initial matter, plaintiffs need not plead detailed facts. *Bartholet v. Reishauer A.G.,* 953 F.2d 1073, 1078 (7th Cir.1992) ("A complaint under Rule 8 limns the claim; details of both fact and law come later, in other documents."). In any event, this court believes plaintiffs have pointed to facts to support their allegations, including the fact that Freitag was disciplined by NASD and that New York Life discovered irregularities in Freitag's customer's accounts.

This court will now address defendants' *Moorman* argument as it relates to the negligent hiring, supervision, and retention claims. It actually consists of two related arguments. First, defendants argue that plaintiffs' claims should be dismissed because plaintiffs are only seeking economic losses and have not alleged any physical injury or damage to property. Second, defendants argue that plaintiffs' claims are barred under the *Moorman* doctrine, which also relates to a claim for economic losses without allegations of physical injury.

As to the first argument, defendants state that no Illinois court has allowed a negligent hiring, supervision, or retention claim to go forward without allegations of physical injury. However, in *Van Horne v. Muller,* 691 N.E.2d 74 (Ill.App.Ct.1998), which was issued after the parties filed their briefs in this case, the Illinois appellate court considered and rejected this argument:

Illinois courts have not explicitly defined the type of injury necessary to sufficiently allege a cause of action under these forms of employer liability. However, precedent establishes that some form of physical injury has been alleged in each of the cases where the complaint has withstood a challenge to its legal sufficiency. [citations omitted.] However, just because physical injury has been alleged in previous cases does not mean that such an allegation is a prerequisite to stating a cause of action under these forms of employer liability. [citation to Restatement of Agency § 213.] A plain reading of this section reveals no requirement that a plaintiff allege physical injury, and *we hold that complaints stating a cause of action for negligent or reckless hiring, supervision and retention need not allege physical injury.*

*Id.* at 79-80 (emphasis added).

*15 The appellate court's holding in *Van Horne* did not specifically discuss the *Moorman* doctrine. Moreover, the Illinois Supreme Court, which reversed the appellate court's holding in part, refused to consider the argument that such claims cannot be brought solely for economic losses, finding that the negligent hiring, supervision, and retention claims failed for other reasons. *Van Horne,* 1998 WL 906736 at *6. Therefore, this court is faced with some uncertainty in predicting how the Illinois Supreme Court would decide this particular argument.

In a very similar argument, defendants assert that the claims are barred under the *Moorman* doctrine. In response, plaintiffs seek to fall within the exception relating to extracontractual duties. As

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 14
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

noted above, in *Congregation of the Passion v. Touche Ross & Co.,* 636 N.E.2d 503 (Ill.1994), the Illinois Supreme Court held that the *Moorman* doctrine does not apply to extracontractual duties. *Touche Ross* involved a tort claim brought by an investor alleging accountant malpractice. Although the parties had entered into a contract, the plaintiff argued that the defendant accounting firm also owed a common law duty of due care in the preparation of plaintiff's financial reports. *Id.* at 512.The court discussed the *Moorman* doctrine and concluded that it does not apply "[w]here a duty arises outside of the contract":

> The evolution of the economic loss doctrine shows that the doctrine is applicable to the service industry only where the duty of the party performing the service is defined by the contract that he executes with his client. Where a duty arises outside of the contract, the economic loss doctrine does not prohibit recovery in tort for the negligent breach of that duty.

*Id.* at 514.The Illinois Supreme Court noted that both the attorney-client and accountant-client relationships involve "something intangible" that "lies in the ideas behind" the documents prepared for the clients (*e.g.* the legal brief or the financial statement).*Id.* at 515.[FN18]

> FN18. An Illinois appellate court subsequently applied the extracontractual duty exception to a case involving an insurance broker.*Kanter v. Deitelbaum,* 648 N.E.2d 1137, 1140 (Ill.App.Ct.1995) (holding that "an insurance broker, admittedly having a fiduciary relationship to an insured, is in no different position than an attorney or an accountant in relationship to plaintiffs").

Under the test set forth in *Touche Ross,* this court must now determine whether the duties involved arose outside the contract. However, this issue is complicated by a number of factors here. First, plaintiffs have not identified a specific document as the contract nor have they described the duties under the contract. Second, the parties have not discussed the *Touche Ross* test in any detail. Defendants, for example, do not identify the relevant "duty" but instead argue generally that the parties had a commercial relationship together. *See Allendale Mut. Ins. Co. v. Bull Data Sys.,* 1994 WL 687579, *14 (N.D.Ill.Dec. 7, 1994) ("The *Touche Ross* decision affirms that the critical task is to define and decide the proper source of the duties undertaken by a party."). Finally, most of the cases discussing the *Touche Ross* exception did not involve the type of torts involved here. These torts do not fit neatly within the analytical framework because they are indirect and are based on the underlying acts of the employee.

*16 Neither party has cited to an Illinois case considering the extracontractual duty exception as it applies to a negligent hiring, supervision, or retention claim as opposed to a negligent misrepresentation claim. New York Life cites to *Midwest Knitting Mills, Inc. v. United States,* 950 F.2d 1295, 1300 (7th Cir.1991), in which the Seventh Circuit did hold that the economic loss doctrine barred a negligent supervision claim. However, the Seventh Circuit considered this issue under Wisconsin law and did so before the Illinois Supreme Court issued its ruling in *Touche Ross.*

Lincoln/CMP cites to *Anderson v. Keip,* 1997 WL 78860 (N.D.Ill. Feb. 24, 1997), in which the district court granted a motion to dismiss a claim for negligent supervision under Illinois law because it was barred under the *Moorman* doctrine. In *Keip,* the plaintiffs alleged that the defendant negligently failed to supervise and control the activities of James Keip, who allegedly sold the plaintiffs investments in violation of the securities laws. The court held, without much discussion, that the *Touche Ross* did not apply because the "alleged duty to supervise Keip [arose] out of a commercial relationship between plaintiffs and Keip."*Id* . at *2. The court therefore granted a motion to dismiss the negligent supervision claim even though the "precise relationship" between the parties was unclear. Similar to defendants' arguments here, the court in *Keip* focused more on the relationship rather than the particular duty.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                          Page 15
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

In addition, in *Johnson Products Co. v. Guardsmark, Inc.,* 1998 WL 102687 (N.D.Ill. Feb. 27, 1998), a district court also granted a motion to dismiss a negligent supervision claim under *Moorman* based on a similar argument. The plaintiff hired the defendant security company to guard plaintiff's warehouse. The parties entered into a written contract to govern their relationship. Plaintiff alleged that the defendant's employees stole large amounts of merchandise from the plaintiff's warehouse over a two-year period. *Id.* at *1. Plaintiff filed suit, asserting, among other things, a claim for negligent supervision under Illinois law and argued the duty to employ honest people and to appropriately supervise them was extracontractual under *Touche Ross.* The court rejected this argument, finding that plaintiff had not identified a "source" of any such duty. *Id.* at *8. The court explained its holding:

A simple analogy illustrates the fallacy of [plaintiff's] argument. The manufacturer of a defective product that simply does not work properly does not owe a duty in tort to the purchaser of the product to use reasonable care in producing the product. Rather, the purchaser's remedy lies in breach of contract; [defendant] had no obligation to use reasonable care in performing its duties for its only obligations arose under the contract itself.

*Id.* at *9.

Based on the reasoning of *Keip* and *Johnson Products,* this court believes that plaintiffs' negligent supervision claims cannot survive *Moorman* to the extent that they relate to Freitag's actions in selling the insurance contracts and annuities. Those acts-and the related duty to supervise them-appear to have arisen under the contract.[FN19] However, as to the alleged forged withdrawals and transfers, this court believes that plaintiffs can state a claim because those acts do not appear to be included within the parties' contract. *Johnson Products* is not inconsistent with this court's ruling. Although that case involved the defendant's alleged failure to supervise employees who stole from the plaintiff, the contract in that case concerned that very issue; namely, the duty to make sure products were not stolen. In contrast here, the parties' contract concerned the separate issue of the sale of insurance products and (presumably) did not concern the issue of theft. Therefore, based on this reasoning, this court will not dismiss this aspect of the negligent hiring, supervision, and retention claims at this stage in the litigation.

> FN19. As noted above, this entire question is complicated here by the fact that plaintiffs have not clearly alleged the duties under the contract. It seems clear based on the allegations of the complaint, however, that the contract related to the sale of insurance products.

C. Illinois Consumer Fraud Act-Counts XII-XIII

*17 Plaintiffs assert claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1 *et seq.,* against New York Life (Count XII) and Lincoln/CMP (Count XIII). (¶¶ 174-181.) Plaintiffs allege that defendants committed "deceptive acts and practices in the sale of insurance and annuities."(¶ 175.) Plaintiffs refer to their earlier allegations in the complaint concerning, among other things, supplying false monthly account statements. (¶ 65.)

New York Life does not even argue that plaintiffs have failed to state the elements of such a claim. Instead, New York Life argues that Count XII is barred by the three-year statute of limitations. 815 ILCS 505/10a(e). New York Life states that plaintiffs filed their complaint on March 29, 1996 and that they surrendered their policies and annuities more than three years before that date.

Plaintiffs argue that the statute of limitations has not run because defendants concealed their injury. *See Highsmith v. Chrysler Credit Corp.,* 18 F.3d 434, 441 (7th Cir.1994) ("a cause of action under the Consumer Fraud Act accrues when a plaintiff 'knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused.' "). Plaintiffs state that they did not know of the injury because defendants sent them monthly account statements de-

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 16
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

signed to hide the improper activity in their accounts. New York Life responds by pointing to certain facts in the complaint which New York Life believes should have put plaintiffs on notice, including the fact that the NASD issued a formal complaint against Freitag in November 9, 1993. This court believes that this argument raises a factual dispute not suited for resolution on a motion to dismiss.

Lincoln/CMP, on the other hand, does not argue the statute of limitations but instead argues that plaintiffs have failed to plead fraud with specificity as required under Fed.R.Civ.P. 9(b). *See, e.g. Appraisers Coalition v. Appraisal Institute,* 845 F.Supp. 592, 608-09 (N.D.Ill.1994) (plaintiffs asserting a Consumer Fraud Act claim based on fraud or misrepresentation must satisfy the particularity requirements of Rule 9(b)). For the reasons stated above, this court believes that plaintiffs have pleaded fraud with sufficient particularity.

D. Breach of Fiduciary Duty-Counts XIV-XV

Plaintiffs assert a claim for breach of fiduciary duty under Illinois law against New York Life (Count XIV) and Lincoln/CMP (XV). Plaintiffs allege that the defendants owed them a "fiduciary duty to pay out the proceeds of their accounts only to authorized persons and to inform its account holders of any irregularities in their accounts or in the conduct of [their] agents."(¶¶ 183, 187.)

Defendants first argue that the relationships between an insurer and an insured and between a broker and a customer are not fiduciary relationships as a matter of law, *See, e.g., Nielsen v. United Services Auto. Ass'n,* 612 N.E.2d 526, 531 (Ill.App.Ct.1993); *Burdett v. Miller,* 957 F.2d 1375, 1381 (7th Cir.1992). Plaintiffs apparently do not seek to rely on the general nature of the relationship but instead seek to establish a fiduciary relationship under the particular facts of this case. *Pommier v. Peoples Bank Marycrest,* 967 F.2d 1115, 1119 (7th Cir.1992) ("It is possible that the particular circumstances surrounding a relationship will make it a fiduciary relationship even if the general class of [ ] relationships is not.")

*18 Defendants argue that the complaint only contains conclusory allegations as to the existence of a fiduciary relationship and does not allege that defendants exhibited dominance and superiority over plaintiffs. *Id.* ("The essence of a fiduciary relationship is that one party is dominated by the other."); *Johnson Products Co. v. Guardsmark, Inc.,* 1998 WL 102687, *5 (N.D.Ill. Feb. 27, 1998) (granting a motion to dismiss: "absent the requisite dominance and influence, Illinois law does not recognize a fiduciary relationship between contracting parties"). This court agrees. Therefore, this court will grant the motion to dismiss the fiduciary duty claims but does so without prejudice.

E. Breach of Contract-Counts XVI-XVII

Plaintiffs allege a claim for breach of contract under Illinois law against New York Life (Count XVI) and Lincoln/CMP (Count XVII). Plaintiffs allege that they entered into a "contractual relationship" whereby defendants were "to make payments out of the plaintiffs' accounts only upon proper authorization from the plaintiffs."(¶¶ 191, 195.)

Defendants argue that plaintiffs have failed to allege the basic elements of a contract claim. This court agrees. Reviewing the allegations of the complaint, it is unclear exactly what the contract was that plaintiffs claim was breached. Was it written or oral? Does it involve the insurance policies and annuities or something else? When was it entered into? What are its general terms? In order to provide defendants with minimal notice, plaintiffs must allege more than their barebones allegations that they "entered into a contractual relationship." *See, e.g., Kane, McKenna & Assocs., Inc. v. Remcorp, Inc.,* 1988 WL 9108 (N.D.Ill. Jan. 1, 1988) (the general allegation that a contract exists, without supporting facts, is merely a legal conclusion); *Talbert v. Home Savs. of Am., F.A.,* 638 N.E.2d 354, 358 (Ill App.Ct.1994). Accordingly, these claims are dismissed without prejudice.

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                        Page 17
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
**(Cite as: Not Reported in F.Supp.2d)**

### F. Conversion-Counts XVIII-XIX

Plaintiffs assert a claim for conversion against both New York Life (Count XVIII) and Lincoln/CMP (XIX). Plaintiffs allege that they "deposited large sums of money" with New York Life. (¶ 199.) Plaintiffs further allege that when they transferred their accounts (principal plus accumulated interest) to Lincoln/CMP, New York Life "did not transfer the amount shown on their [monthly] statements."(¶ 201.) Therefore, New York Life allegedly converted to its own use and possession the portion of their funds that was not transferred (*i.e.* the difference between the amount on the monthly balance and the amount transferred). (¶ 202.) Similar allegations are made against Lincoln/CMP except that instead of failing to transfer their accounts Lincoln/CMP allegedly failed to return the funds after plaintiffs made a demand. (¶¶ 203-07.)

The defendants argue that plaintiffs have failed to allege the elements necessary to state a claim for conversion under Illinois law. To allege a claim for conversion under Illinois law, plaintiffs must allege: "(1) an unauthorized and wrongful assumption of control, dominion, or ownership by a defendant over a plaintiff's personalty; (2) plaintiff's right in the property; (3) plaintiff's right to immediate possession of the property, absolutely and unconditionally; and (4) a demand for possession of the property."*Voutiritsas v. Intercounty Title Co. of Illinois,* 664 N.E.2d 170, 181 (Ill.App.Ct.1996).

*19 Although the defendants state that plaintiffs have not alleged any of the necessary elements to state a conversion claim under Illinois law, defendants really only mount a serious objection to the requirement that plaintiffs allege that defendants converted "personalty." As a general rule, money is not recoverable in a conversion claim under Illinois law unless the money can be described as "specific chattel." *In re Thebus,* 483 N.E.2d 1258, 1260 (Ill.1985) ("[m]oney may be the subject of conversion, but it must be capable of being described as a specific chattel .... However, an action for the conversion of funds may not be maintained to satisfy a mere obligation to pay money.").

Defendants argue that plaintiffs have not described an exact dollar amount in their accounts. Although true, defendants have not cited to any case law holding that a specific dollar amount is required. Plaintiffs have identified specific money that is capable of being described (*i.e.* the funds in their accounts). Lincoln/CMP cites to cases holding that bank accounts cannot be the subject of a conversion action. *See, e.g., Bachmeier v. Bank of Ravenswood,* 663 F.Supp. 1207, 1225 (N.D.Ill.1987). However, Lincoln/CMP fails to cite to any case holding that funds deposited to purchase an insurance policy or annuity cannot be the subject of a conversion action. *See Fonda v. General Casualty Co. of Illinois,* 665 N.E.2d 439, 444 (Ill.App.Ct.1996) (allowing conversion claim by secured creditor for payment of debtor's "insurance proceeds").

New York Life also argues that plaintiffs' conversion claim is inconsistent with other allegations in the complaint. Specifically, plaintiffs seek to recover the difference between the amounts reflected on their monthly account statements and the amount actually transferred. Yet, plaintiffs elsewhere allege in their complaint that no such funds existed because the monthly statements were false. (¶ 65.) While it may be true that plaintiffs' allegations are inconsistent, this is not a reason to dismiss the conversion claim. In sum, plaintiffs' allegations regarding the conversion claim, although minimal, are sufficient to provide defendants with notice of the claim.

### IV. Other Pending Motions.

In addition to the motions to dismiss the original complaint, there are also a number of other motions pending before the court. This court will rule on such motions in a separate opinion. However, two of the motions are impacted by this ruling.

First, defendants have filed a motion to strike an amended complaint that has already been filed by plaintiffs. Because this court is granting plaintiffs leave to file an amended complaint consistent with this opinion, this court will strike

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Case 1:08-cv-00195 Document 12-4 Filed 02/15/2008 Page 19 of 19

Page 19 of 19

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690
(Cite as: Not Reported in F.Supp.2d)

Page 18

without prejudice the amended complaint already filed by plaintiffs. However, plaintiffs may include in the newly-filed amended complaint any allegations in the already-filed amended complaint that were not addressed in this opinion. At such time as this court rules on a motion to dismiss or motion for summary judgment regarding the newly-filed amended complaint, it can address the defendants' arguments relating to those allegations. Second, New York Life has filed a separate motion to dismiss the RICO claims of two plaintiffs who have died since this litigation began. Because this court has dismissed the RICO claims, it will deny New York Life's motion without prejudice.

## CONCLUSION

*20 For the reasons set forth above, this court grants in part and denies in part the defendants' motions to dismiss. Counts I, II, III, IV, V, VII (in part), X, and XI are dismissed with prejudice. Counts VI (in part), XIV, XV, XVI, and XVII are dismissed without prejudice. The motions to dismiss the remaining claims are denied. This court also denies without prejudice New York Life's motion for summary judgment regarding the RICO claims. This court grants the motion to strike the already-filed amended complaint. Plaintiffs are granted leave to file an amended complaint, consistent with this opinion, within 21 days.

N.D.Ill.,1999.
Soranno v. New York Life Ins. Co.
Not Reported in F.Supp.2d, 1999 WL 104403 (N.D.Ill.), RICO Bus.Disp.Guide 9690

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.